# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BEYOND PESTICIDES, 701 E Street, SE, Suite 200, Washington, DC 20003, on behalf of the general public,<br><br>    Plaintiff,<br><br>v.<br><br>DR PEPPER SNAPPLE GROUP, INC., 5301 Legacy Drive, Plano, Texas 75024, and MOTT'S LLP, 900 King Street, Rye Brook, NY 10573<br><br>    Defendants. | Civil Action No. 1:17-cv-1431-RCL<br><br>**FIRST AMENDED COMPLAINT** |

On behalf of the general public, Plaintiff Beyond Pesticides (the "Plaintiff"), by and through its counsel, alleges the following based upon its own personal knowledge and the investigation of its counsel.

## NATURE OF THE ACTION

1.    Plaintiff brings this suit under the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28- 3901 *et seq.* (the "DC CPPA"), against Dr Pepper Snapple Group Inc. ("Dr Pepper") and Mott's, LLP, a wholly owned subsidiary of Dr Pepper (collectively, "Defendants"), for misleading consumers about the nature of several applesauce and apple juice products that were or are sold under the "Mott's" brand name, including Mott's Natural Unsweetened Applesauce, Mott's Healthy Harvest Applesauce varieties, Mott's Natural 100% Juice Apple Juice, and other varieties of

"Mott's" brand applesauce and apple juice products sold with the representation "All Natural Ingredients" and/or "Natural" (collectively, the "Products").[1]

2. During the applicable limitations period, Defendants engaged in and Defendants continue to engage in, a widespread, uniform marketing campaign on the packaging, website, and advertisements of the Products to mislead consumers about the nature and quality of the Products.

3. Specifically, Defendants represented the Products as made of "All Natural Ingredients" or as "Natural" in two ways. First, Defendants represented that their applesauce contained "All Natural Ingredients." As seen in the representative images below, this representation was made prominently on the front of the package, in a blue badge that also informed the consumer that the applesauce did not contain added sugar but did contain added vitamin C. This representation was placed on the label adjacent to the identifying the flavor or variety of the applesauce.



---

[1] Within the past year, Defendants have discontinued offering the applesauce products labeled as "Natural" and may discontinue the apple juice or else may introduce (or reintroduce) new products that are also falsely labeled as made of "All Natural Ingredients," "Natural," or other similarly misleading representations. Plaintiff reserves the right to add or remove products to the definition of this Complaint as they become known.



4.      Second, as seen in the representative images above, defendants previously sold a variety of applesauce identified as "Natural" in order to differentiate it from other varieties, such as cinnamon-flavored or organic applesauce. The "Natural" label conveyed to consumers that this variety of applesauce contained nothing that is not natural or synthetic. Defendants currently produce and market a variety of apple juice that is labeled

"Natural." This labeling also conveys to consumers that there is nothing unnatural in the apple juice, as seen in the representative image below.



5.      Defendants' "All Natural Ingredients" and "Natural" statements deceive and mislead consumers into believing the Products contain nothing unnatural or synthetic.

6.      The Products, which are sold in numerous supermarket chains within the District and nationally, are not "Natural." Instead, the Products contain a synthetic and unnatural chemical, specifically, acetamiprid.

7.      Acetamiprid is not "Natural."

8. Acetamiprid is a synthetic neonicotinoid insecticidal neurotoxin that may be hazardous to human development and to other animals including the honeybee.

9. Acetamiprid is "legal" in connection with food products, insofar as the law does not preclude the use of acetamiprid in treating and harvesting crops, and has made allowances for certain amounts of residues to remain on fruits and vegetables before they are delivered to the end user to be cleaned and consumed. Defendants, however, did not and do not simply claim that the Products are "legal"; instead, Defendants claim the Products contain nothing but "All Natural Ingredients" or are "Natural."

10. By deceiving consumers about the nature and quality of the Products, Defendants are able to sell a greater volume of product, to charge higher prices for the Products, and to take away market share from competing products, thereby increasing sales and profits.

11. Consumers lack the scientific knowledge necessary to determine whether the Products contain anything except "All Natural Ingredients," whether the Products truly are "Natural," or to know or to ascertain the true contents and quality of the Products. Reasonable consumers must rely and do rely on Defendants to report honestly which substances the Products contain, and whether the Products contain only "All Natural Ingredients" or whether the Products are "Natural."

12. Across all Defendants' Products, Defendants conceal the presence of acetamiprid and fail to inform consumers of the presence of acetamiprid in the Products.

13. Reasonable consumers do not expect products labeled "All Natural Ingredients" or "Natural" would contain a synthetic, unnatural chemical.

14. No synthetic, unnatural, and potentially dangerous chemical is disclosed

anywhere on the Products' packaging. The presence of acetamiprid can be ascertained only through a sophisticated chemical study far beyond a reasonable inquiry that a consumer could be expected to do in a supermarket aisle. Thus, when deciding which products to buy, consumers must and do rely on affirmative representations made by Defendants, such as "All Natural Ingredients" and "Natural."

15. Defendants were motivated to mislead consumers for no other reason than to command more favorable pricing and/or to take away market share from competing products, thereby increasing the Products' sales and profits.

16. Because the Products contain a synthetic and unnatural chemical, Defendants' claims on the Products' labeling and in the Products' marketing that the Products are made of "All Natural Ingredients" and/or are "Natural" are false and misleading.

17. Defendants' false and misleading representations and omissions violate the DC CPPA, D.C. Code §§ 28-3901, *et seq*.

18. Because Defendants' labeling and advertising of the Products tends to mislead and is materially deceptive about the true nature and quality of the Products, Plaintiff brings this deceptive advertising case on behalf of the general public, and seeks relief including an injunction to halt Defendants' false marketing and sale of the Products.

## JURISDICTION AND VENUE

19. Courts within the District of Columbia have personal jurisdiction over the parties in this case. Plaintiff, by filing this Complaint, consents to this Court having personal jurisdiction over them.

20.     Beyond Pesticides is a 501(c)(3) non-profit public-interest organization headquartered in the District of Columbia.

21.     This Court has personal jurisdiction over Defendants pursuant to D.C. Code § 13-423. Defendants have sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court because, *inter alia*, Defendants are engaged in deceptive schemes and acts directed at persons residing in, located in, or doing business in the District of Columbia, and otherwise purposefully avail themselves of the laws of this District through their marketing and sale of the Products in this District.

22.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of the District of Columbia.  Defendant Dr Pepper is incorporated under the laws of Delaware with its principal place of business in the State of Texas.  Defendant Motts is a corporation incorporated under the laws of the State of Delaware with its principal place of business in New York. The matter in controversy exceeds $75,000, exclusive of interest and costs.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature and quality of the Products, occurred within this District. The Products are available for purchase at retail stores in the District of Columbia.

## PARTIES

24.     Plaintiff Beyond Pesticides is a 501(c)(3) nonprofit public interest organization headquartered in the District of Columbia that works with allies in protecting public health and the environment to lead the transition to a world free of toxic pesticides.

The organization's primary goal is to effect change through local action, assisting individuals and community-based organizations to stimulate discussion on the hazards of toxic pesticides, while providing information regarding safe alternatives.

25.    Beyond Pesticides promotes safe air, water, land, and food, and works to protect public health and the environment by encouraging a transition away from the use of toxic pesticides, including systemic neonicotinoid pesticides like acetamiprid, the main chemical at issue in this lawsuit. With the resources of Beyond Pesticides made available to the public on a national scale, Beyond Pesticides contributes to a significant reduction in unnecessary pesticides use, thus improving public health and the environment.

26.    Beyond Pesticides has historically taken a two-pronged approach to the pesticide problem by identifying the risks of conventional pest management practices and promoting non-chemical and least toxic management alternatives. For example, Beyond Pesticides produces the quarterly newsletter *Pesticides and You*, which provides in-depth articles and a voice for pesticide safety and alternatives. In 2014, *Pesticides and You* published a front-page article titled "No Longer a Big Mystery," a report summarizing the science behind bee declines. The document provided scientific evidence demonstrating that pesticides, especially the neonicotinoid class of insecticides, have sub-lethal and chronic impacts on bee behavior, immune systems, and colony longevity. A second *Pesticides and You* article, published in 2014 and titled "Bees, Bird and Beneficials," also focused on the range of harmful impacts threatening pollinators and wildlife. Additionally, Beyond Pesticides' "Daily News Blog" provides the most current information on pesticide issues, and has featured articles on neonicotinoids like acetamiprid over 200 times since 2013, with 69 articles written in 2015, 39 in 2016, 58 in 2017, and 41 so far in 2018. Beyond

Pesticides also disseminates information regarding neonicotinoids and alternatives to their use through the creation of fact sheets made available to the public through its website.

27.     Beyond Pesticides has submitted comments to the EPA regarding neonicotinoids dozens of times over the past 10 years, with the most recent comments focusing on dinotefuran, imidacloprid, clothianidin and thiamethoxam. Beyond Pesticides also is a member of the EPA workgroup "Pesticide Program Dialogue Committee" that meets twice a year to develop and recommend ways to protect pollinators at the state and national level.

28.     In addition, Beyond Pesticides regularly engages its members to take action regarding neonicotinoids.  Not only does Beyond Pesticides have 1,427 members, its list serve reaches 49,307 people who have signed up to receive emails. In 2016, Beyond Pesticides sent an alert requesting members and people on the list serve take action against neonicotinoids by submitting comments to EPA about imidacloprid, to which 4,224 people responded; in 2017 they asked people to send a message to Administrator of the Environmental Protection Agency Scott Pruitt requesting that he publish the neonicotinoid assessments for public comment, to which 4,319 people responded. In consumer actions, in 2017 they asked people to contact Amazon CEO Jeff Bezos and ask him to remove neonicotinoids from Amazon's website, an action 5,312 people participated in. Similarly, 4,289 individuals responded to a Beyond Pesticides request to contact True Value and Ace hardware stores, calling on them to eliminate neonicotinoids.

29.     Beyond Pesticides also holds an annual national conference that draws an attendance of around 200 people.  It is in a different location each year, and in 2017 took place in Minneapolis, Minnesota.  One of the keynote speakers was Vera Krischik, Ph.D., a

tenured faculty in the Entomology Department at the University of Minnesota whose lab does research on insect exposure to various neonicotinoids, most recently imidacloprid and clothianidin. She spoke about the research process that evaluated the effect of imidacloprid soil treatment on bumblebees in lab and field studies, which determined that negative effects were present below the U.S. EPA's 2016 no observable effect level.

30.     Finally, Beyond Pesticides has worked for more than 30 years to develop and uphold the standard associated with organic production, including raising consumer awareness as to what organic is, and why it is preferable to conventionally grown foods. The rampant use of the term "Natural" over the past decade by companies like Dr. Pepper Snapple Inc. has undermined the organic system, prompting Beyond Pesticides and its allies to call on FDA to ban the word "Natural" on labeling, or to define via an official rulemaking what makes a product "Natural."

31.     On May 3, 2017, in order to evaluate their purported qualities as a product made of "All Natural Ingredients" or as a "Natural" product, Beyond Pesticides purchased Mott's Natural Applesauce from Capital Supreme Market located at 501 4th Street, SE in Washington, D.C., and Mott's Strawberry Kiwi Applesauce from a Safeway Store located at 415 14th Street, SE in Washington, D.C.

32.     Prior to filing this Amended Complaint, Beyond Pesticides also purchased Mott's Natural 100% Juice Apple Juice from a Safeway Store located at 1100 4th Street, SW in Washington, D.C. in order to evaluate its purported qualities as a "Natural" product.

33.     At all times mentioned herein, Defendant Dr Pepper Snapple Group, Inc. was a corporation organized under the laws of Delaware, with its principal place of business at 5301 Legacy Drive, Plano, Texas, 75024. Dr Pepper is in the business of

developing, manufacturing, distributing, and selling beverages and snack products under various brands, including the Mott's brand.

34.    At all times mentioned herein, Defendant Mott's, LLP operates as a subsidiary of Dr Pepper. Mott's, LLP is organized under the laws of Delaware, with its principal place of business at 900 King Street, Rye Brook, NY 10573. Mott's, LLP is a nationally and internationally prominent maker of fruit snacks, applesauce, apple juices, and fruit rolls.

35.    Defendants manufacture and/or cause the manufacture of the Products, which Defendants market and distribute in retail stores in the District of Columbia and throughout the United States.

36.    Upon information and belief, Defendants have caused harm to the general public of the District of Columbia.

37.    Plaintiff Beyond Pesticides is acting for the benefit of the general public pursuant to D.C. Code § 28-3905(k)(1). Plaintiff is a non-profit organization pursuant to D.C. Code § 28-3901(a)(14).

## SUBSTANTIVE ALLEGATIONS

38.    Plaintiff brings this suit under the DC CPPA, D.C. Code § 28-3901 *et seq.*, against Defendants based on misrepresentations and omissions committed by Defendants regarding the Products, which Defendants falsely and deceptively label and market as made of "All Natural Ingredients" and/or as "Natural," when in fact the Products contain acetamiprid, which is not natural.

39.    In recent years, consumers have begun to seek out "Natural" food items and beverages. As a result, sales have increased for foods and beverages that are entirely

natural.

40.     Consumers value products that are "Natural" for myriad reasons, including the perceived health benefits of natural food and drinks and avoiding unnatural, difficult-to-pronounce chemicals that would not normally be expected to be present in foods and drinks.

41.     Defendants know that consumers seek out and wish to purchase natural and pure foods that do not contain artificial chemicals, and that consumers will pay more for foods that they believe to be natural than they will pay for foods that they do not believe to be natural.

42.     A recent nationally representative Consumer Reports survey of 1,005 adults found that more than half of consumers usually seek out products with a "natural" food label.[2]

43.     To capture this market, Defendants market the Products as made of "All Natural Ingredients" and/or as "Natural."

**A.     Defendants Falsely Claim the Products Are Made of "All Natural Ingredients" and/or Are "Natural."**

44.     As discussed above, on the Product labels, Defendants prominently market the Products as made of "All Natural Ingredients" and/or as "Natural."

45.     Defendants' representations that the Products are made of "All Natural Ingredients" and/or are "Natural" are false and misleading because a reasonable consumer believes that Products that are "Natural" do not contain a synthetic and unnatural chemical;

---

[2] *See* Consumer Reports National Research Center, "Natural Food Labels Survey" (2016), *available at* http://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf (last visited Sept. 28, 2018).

in fact, however, the Products contain acetamiprid.

46.     Quantitative testing revealed that the Products contain acetamiprid.

47.     Tests conducted by an independent laboratory using liquid chromatography mass spectrometry with a reporting limit of 0.01 parts per million (ppm) revealed the amount of acetamiprid in Mott's Natural Unsweetened Applesauce to be 0.06 ppm and the amount of acetamiprid in Mott's Natural 100% Juice Apple Juice to be 0.02 ppm.

48.     Nowhere on the Products' packaging or on Defendants' website do Defendants mention the presence of acetamiprid in the Products.

**B.     Defendants' Labels Are Misleading and Omit Material Facts.**

49.     Upon information and belief, Defendants have profited enormously from their falsely marketed Products and their carefully orchestrated labels and images.

50.     Representing that a product is made of "All Natural Ingredients" and/or is "Natural" is a statement of fact.

51.     Failing to disclose that a product represented as made of "All Natural Ingredients" and/or as "Natural" in fact contains acetamiprid is an omission of relevant fact.

52.     Consumers reasonably believe that a product represented as made of "All Natural Ingredients" and/or as "Natural" does not contain any synthetic or unnatural chemicals.

53.     Testing reveals the presence of acetamiprid in the Products. Only Defendants know the methods by which the Products are grown, harvested, and processed or what would account for the presence of acetamiprid in the Products. Defendants' concealment tolls applicable statutes of limitations.

54.     To this day, Defendants continue to conceal and suppress the true nature,

identity, source, and method of production of the Products here at issue.

55.     In 2014, the Consumer Reports National Research Center conducted a nationally representative phone survey to assess consumer opinion regarding food labeling.[3] Sixty-six percent of all respondents in the Consumer Reports survey said that a "natural" label on packaged and processed foods means that "no toxic pesticides were used."[4]

56.     Defendants know and intend that when consumers see product labels or advertisements promising a product is made of "All Natural Ingredients" or is "Natural," consumers will understand that to mean that, at the very least, the product does not contain any synthetic and unnatural or potentially harmful chemicals.

57.     Defendants know what representations are made on the labels of the Products. Defendants also know how the Products were grown, harvested, and processed, and that the Products are likely to contain acetamiprid when delivered to the end user.

58.     Defendants thus knew all the facts demonstrating that the Products were mislabeled and falsely advertised.

**C.     Acetamiprid Is Not Natural.**

59.     Acetamiprid is a synthetic neonicotinoid insecticidal neurotoxin that causes generalized, nonspecific toxicity in mammals.[5]

---

[3]*See* Consumer Reports National Research Center, "Organic Food Labels Survey 2014 Nationally Representative Phone Survey" (Mar. 2014), *available at* http://greenerchoices. org/wp-content/uploads/2016/08/CR2014OrganicFoodLabelsSurvey.pdf (last visited Sept. 28, 2018).

[4] *See id.*

[5] Environmental Protection Agency, "Acetamiprid: Pesticide Fact Sheet" (Mar. 15, 2002), *available at* https://www3.epa.gov/pesticides/chem_search/reg_actions/

60.     Neonicotinoids like acetamiprid are "systemic" insecticides. Systemic insecticides are absorbed into the plant to be distributed throughout the plant, into the fibers, pollen, and nectar. Systemic insecticides kill insects in two different ways: Insects die when they come into contact with the pesticide, as when they are sprayed with it, and also when they ingest the plant which has absorbed the pesticide.

61.     Neonicotinoids like acetamiprid are believed to play a role in "colony collapse disorder" and may pose a risk to honeybees and other pollinators necessary for functioning ecosystems and agriculture.[6] Although the EPA has found that acetamiprid, by itself, is not highly toxic to bees, its use may lead to a decline in queen bees in colonies, interfere with the ability of bees to navigate back to their hives, and contribute to the suppression of bees' immune system at "sub-lethal" levels, making them susceptible to disease.[7]

62.     A multi-generation reproduction study on rats of the safety of acetamiprid found evidence of adverse effects on the offspring, including decreases in body weights in both generations, reductions in litter size, and viability.[8]

---

registration/fs_PC-099050_15-Mar-02.pdf (last visited Sept. 28, 2018).

[6] Elizabeth Grossman, "Declining Bee Populations Pose a Threat to Global Agriculture" Yale Environment 360 (Apr. 30, 2013), http://e360.yale.edu/features/declining_bee_populations_pose_a_threat_to_global_agriculture (last visited Sept. 28, 2018).

[7] *Id*; *see also* Stephanie Strom, "The Bee Mogul" N.Y. Times, Feb. 16, 2017, at BU1 *available at* https://www.nytimes.com/2017/02/16/business/a-bee-mogul-confronts-the-crisis-in-his-field.html?_r=0 (last visited Sept. 28, 2018).

[8] Environmental Protection Agency, "Acetamiprid: Pesticide Fact Sheet" (Mar. 15, 2002), *available at* https://www3.epa.gov/pesticides/chem_search/reg_actions/ registration/fs_PC-099050_15-Mar-02.pdf (last visited Sept. 28, 2018)

63. Preliminary research indicates that acetamiprid may also have adverse effects on human nervous system development.[9] Acetamiprid may adversely affect the development of neurons and has the potential to affect some brain functions such as learning and memory.[10]

64. Acetamiprid is not "Natural."

65. Acetamiprid should not be present in applesauce made of "All Natural Ingredients" or in "Natural" applesauce or apple juice.

66. Defendants' representations that the Products are made of "All Natural Ingredients" and/or are "Natural" are false, and labeling or advertising the Products as such is misleading and deceptive.

**D. Defendants Knew the Representations Were False, and Intended for Consumers to Rely on the Misrepresentations and Omissions.**

67. Defendants hold themselves out to the public as trusted experts in the production of applesauce, apple juice, and other apple and fruit products.

68. Defendants knew what representations they made on the labels of the Products. They also knew how the Products were harvested and processed, and that they contain acetamiprid, a synthetic and unnatural pesticide.

69. Defendants thus knew, or should have known, the facts demonstrating that

---

[9] Danny Hakim, "European Agency Warns of Risk to Humans in Pesticides Tied to Bee Deaths" N.Y. Times, Dec. 18, 2013, at B2 *available at* http://www.nytimes.com/2013/12/18/business/international/europe-warns-of-human-risk-from-insecticides.html (last visited Sept. 28, 2018).

[10] *See* EFSA PPR Panel (EFSA Panel on Plant Protection Products and their Residues), "Scientific Opinion on the developmental neurotoxicity potential of acetamiprid and imidacloprid" EFSA Journal 2013;11(12):3471, 47 (Feb. 21, 2014) *available at* http://onlinelibrary.wiley.com/doi/10.2903/j.efsa.2013.3471/epdf (last visited Sept. 28, 2018).

the Products were mislabeled and falsely advertised.

70.    Consumers frequently rely on label representations and information in making purchase decisions, especially in purchasing food.

71.    Although reliance is not an element of the DC CPPA, Defendants made the false, misleading, and deceptive representations and omissions intending for consumers to rely upon these representations and omissions in purchasing the Products.

72.    In making the false, misleading, and deceptive representations and omissions at issue, Defendants knew and intended that consumers would purchase the Products when consumers would otherwise purchase a competing product.

73.    Consumers are willing to pay more for products that are made entirely of "Natural" ingredients than those that do not claim to be "Natural," and they expect those "Natural" products to be free of any synthetic chemicals. Consumers will also buy a larger quantity of products that are "Natural" and contain nothing except "All Natural Ingredients" than they would buy of products that do not claim to be "Natural." Thus, labeling the Products as made of "All Natural Ingredients" and/or as "Natural" furthers Defendants' private interest of increasing sales of the Products and decreasing the sales of competing products that are truthfully marketed as all-natural and/or acetamiprid-free.

74.    Defendants know that consumers prefer "Natural" ingredients and foods that do not contain synthetic and unnatural or potentially dangerous chemicals.

75.    The Products are widely purchased by consumers in order to be served to

their children[11]

76.     Children face unique dangers from pesticide exposure. The National Academy of Sciences reports that children are more susceptible to the effects of pesticides than adults are and estimates that 50% of lifetime pesticide exposures occur during the first five years of life.[12] In fact, studies show children's developing organs create "early windows of great vulnerability" during which exposure to pesticides can cause great damage.[13]

77.     Generally, children are more susceptible to the effects of pesticides than adults, as children take in more pesticides relative to body weight than adults and have developing organ systems that are more vulnerable and less able to detoxify toxic chemicals.[14] In fact, children ages 6-11 nationwide have significantly higher levels of pesticide residues in their bodies than all other age categories.[15]

---

[11] U.S.D.A. ERS, "Canned Fruit and Vegetable Consumption in the United States An Updated Report to Congress," 19 (Oct. 2010) *available at* https://www.ers.usda.gov/webdocs/publications/42765/8050_ap050.pdf?v=41055 (explaining that children younger than five eat more applesauce than older children and adults) (last visited Sept. 28, 2018).

[12] National Research Council, National Academy of Sciences, "Pesticides in the Diets of Infants and Children," 184-185 (1993).

[13] Landrigan, P.J., L Claudio, SB Markowitz, et al., "Pesticides and inner-city children: exposures, risks, and prevention." Environmental Health Perspectives 107 (Suppl 3) 431-437 (1999).

[14] US EPA, Office of the Administrator, "Environmental Health Threats to Children," EPA 175-F-96-001, September 1996 *available at* https://nepis.epa.gov/Exe/ZyPDF.cgi/40000839.PDF?Dockey=40000839.PDF (last visited Sept. 28, 2018).

[15] Centers for Disease Control and Prevention, "Second National Report on Human Exposure to Environmental Chemicals," (Jan. 2003).

78.    Defendants know or should know that many consumers buy foods marketed as "Natural" and/or free of synthetic and unnatural chemicals in an attempt to limit the amount of pesticides they and their families ingest.

79.    Defendants know that some consumers would not purchase the foods at all unless they were "Natural" and/or free of synthetic and unnatural and potentially dangerous chemicals.

80.    When consumers purchase the Products, the presence of acetamiprid is not disclosed.

81.    Defendants' conduct in labeling or representing the Products as made of "All Natural Ingredients" and/or as "Natural" deceived and/or was likely to deceive the public.

82.    Consumers were deceived into believing that the Products are made of "All Natural Ingredients" and/or are "Natural" and that the Products contained nothing synthetic or unnatural.

83.    Consumers cannot discover the true nature of the Products from reading the labels. Consumers could not discover the true nature of the Products even by visiting Defendants' websites, which make no mention of acetamiprid.

84.    Upon information and belief, Defendants have failed to remedy the problems with the Products, have continued to sell products falsely labeled as "Natural," or may introduce additional products also falsely labeled as "Natural," thus causing future harm to consumers.

85.    Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold as is, labeled as "Natural" while omitting any reference to the

presence of acetamiprid.

86.   Defendants have failed to provide adequate relief to members of the consuming public as of the date of this Amended Complaint.

87.   Plaintiff contends that the Products were sold pursuant to unfair and unconscionable trade practices, because the sale of the Products offends public policy and is immoral, unethical, oppressive, unscrupulous, and caused substantial economic injuries to consumers.

88.   Reasonable consumers do not expect products represented and advertised as made of "All Natural Ingredients" or as "Natural" to contain a synthetic chemical such as acetamiprid. Defendants' statements and other representations convey a series of express and implied claims and/or omissions that Defendants know are material to the reasonable consumer in making a purchasing decision, and that Defendants intended for consumers to rely upon when choosing to purchase the Products.

89.   Defendants misrepresented the nature and quality of the Products, and this conduct was and is false, misleading, and/or likely to deceive reasonable consumers. Reasonable consumers expect that if a product is labeled as made of "All Natural Ingredients" or as "Natural," the manufacturer is not omitting reference to the presence of a synthetic and unnatural chemical; otherwise, consumers are denied the opportunity to make informed purchasing decisions.

90.   Accordingly, Plaintiff seeks declaratory relief in the form of an order declaring Defendants' conduct to be unlawful, as well as injunctive relief putting an end to Defendants' misleading and unfair business practices, including a change to the current Products' labels and marketing, or a reformulation of the Products so that the Products no

longer contain acetamiprid.

**CAUSE OF ACTION**
**VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER**
**PROTECTION PROCEDURES ACT**

91.    Pursuant to D.C. Code §§ 28-3905(k)(1) and 28-3905(k)(2), Plaintiff brings this Count against Defendants on behalf of the general public of the District of Columbia, for Defendants' violation of DC CPPA, D.C. Code § 28-3901, *et seq*.

92.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

93.    Defendants have labeled and advertised the Products as made of "All Natural Ingredients" and/or as "Natural" and have otherwise presented an image and marketing materials suggesting that the Products are natural, when in fact the Products contain a synthetic and unnatural chemical.

94.    Defendants' labeling and advertising of the Products misrepresents, tends to mislead, and omits facts regarding the source, characteristics, standard, quality, and grade of the Products.

95.    Defendants' misleading labeling and advertising include statements that the Products are made of "All Natural Ingredients" and/or are "Natural."

96.    Defendants' labeling and marketing materials make representations and use innuendo that tends to mislead reasonable consumers into believing that the Products are natural, with 100% natural ingredients, and do not contain any synthetic and unnatural chemical.

97.    The representations omit the truth about the Products, namely, that the Products contain acetamiprid.

98.     The Products lack the characteristics, benefits, standards, qualities, or grades that Defendants state and imply in their labeling and advertisements.

99.     These misstatements, innuendo, and omissions are material and have the tendency to mislead.

100.    Defendants knowingly did not sell the Products as advertised.

101.    The facts as alleged above demonstrate that Defendants have violated the DC CPPA, D.C. Code § 28-3901 *et seq.* Specifically, Defendants have violated D.C. Code § 28-3904, which makes it an unlawful trade practice to:

> (a)     represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . .

> (d)     represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

> (e)     misrepresent as to a material fact which has a tendency to mislead;

> (f)     fail to state a material fact if such failure tends to mislead;

> > (f-1)    [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead; … [or]

> (h)     advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

102.    The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904.

103.    Though Plaintiff need not show proof of deception to succeed on its DC CPPA claim, consumers were in fact deceived. Defendants knew or should have known

that reasonable consumers would believe that the Products are made of "All Natural Ingredients" or are "Natural" as labeled and advertised.

104. Plaintiff has a sufficient nexus to consumers of the Products to adequately represent those interests.

105. Because Defendants misrepresent the characteristics and benefits of the Products; misrepresent the standard, quality, and grade of the Products; misrepresent, fail to state, and use innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about the Products; and advertise the Products without the intent to sell the Products as advertised, Defendants' labeling and marketing of the Products as made of "All Natural Ingredients," and as "Natural," violates D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h).

106. Defendants are "person[s]" within the meaning of D.C. Code § 28-3901(a)(1), "merchant[s]" under § 28-3901(a)(3), and provide "goods" within the meaning of § 28-3901(a)(7).

107. Pursuant to D.C. Code § 28-3905(k)(1)I, "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes."

108. Via §§ 28-3905(k)(1)I and (k)(1)(D)(i), the DC CPPA allows for non-profit organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III.

109. Plaintiff is a "person" within the meaning of D.C. Code § 28-3901(a)(1) and a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

110. Plaintiff brings this Count against Defendants for Defendants' violation of the DC CPPA, D.C. Code § 28-3901 *et seq*.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants and request the following relief:

A.    a declaration that Defendants' conduct is in violation of the DC CPPA;

B.    an order enjoining Defendants' conduct found to be in violation of the DC CPPA, as well as corrective advertising;

C.    an order granting Plaintiff's costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law; and

D.    such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: October 1, 2018

Respectfully submitted,

**RICHMAN LAW GROUP**

By: Kim E. Richman

(D.C. Bar No. 1022978)
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 687-8291
Facsimile: (212) 687-8292
krichman@richmanlawgroup.com

*Attorneys for Plaintiff*